UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER BROWN, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>JOHN P. CALAMOS, SR., Trustee of the Calamos Convertible Opportunities and Income Fund, WESTON W. MARSH, Trustee of the Calamos Convertible Opportunities and Income Fund, JOE F. HANAUER, former Trustee of the Calamos Convertible Opportunities and Income Fund, JOHN E. NEAL, Trustee of the Calamos Convertible Opportunities and Income Fund, WILLIAM R. RYBAK, Trustee of the Calamos Convertible Opportunities and Income Fund, STEPHEN B. TIMBERS, Trustee of the Calamos Convertible Opportunities and Income Fund, DAVID D. TRIPPLE, Trustee of the Calamos Convertible Opportunities and Income Fund, CALAMOS ADVISORS, LLC, an investment advisor and Delaware limited liability company, CALAMOS ASSET MANAGEMENT, INC, a Delaware corporation and publicly-held holding company, CALAMOS CONVERTIBLE OPPORTUNITIES AND INCOME FUND, a Delaware statutory trust, and JOHN AND JANE DOES 1-100,<br><br>    Defendants. | Case No. 10-cv-6558<br><br>U.S. District Judge Elaine E. Bucklo<br><br>Magistrate Judge Shelia M. Finnegan |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR REMAND**

I.  **INTRODUCTION**

  Plaintiff, Christopher Brown ("Plaintiff"), filed this action in Cook County Circuit Court on September 13, 2010. Defendants removed this action on October 13, 2010. Because Defendants' basis for removal is a flawed theory of federal jurisdiction that grossly misstates the nature of Plaintiffs' claims, Plaintiff respectfully requests that the action be remanded to state

court.

## II. ARGUMENT

Defendants' sole alleged basis for federal jurisdiction in this matter is the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. §§ 77p and 78bb ("SLUSA"). Defendants correctly note that SLUSA applies only if four conditions are met. Because the fourth of these conditions – that the action alleges either "a[n] untrue statement or omission of a material fact in connection with the purchase or sale of a covered security [or that the defendant] used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security," 15 U.S.C. §77p(b), (c), 15 U.S.C. §78 bb(f)(1), (2) – is categorically not met here, the action must be remanded.

In support of its contention that SLUSA applies here, Defendants, at pages 4-5 of their Notice of Removal, list various allegations contained in the Complaint, and assert that those allegations are allegations of misrepresentations or omissions of material fact in connection with the purchase or sale of covered securities. But a simple reading of the allegations and the balance of the Complaint reveals otherwise. In fact, to make the nature of Plaintiffs' allegations perfectly clear and to avoid precisely this frivolous removal of the action, the Complaint affirmatively alleges that it does not contain any allegations based on misstatements or omissions. *See* Complaint ¶ 4 ("Plaintiff does not assert by this action any claim arising from a misstatement or omission in connection with the purchase or sale of a security, nor does Plaintiff allege that Defendants engaged in fraud in connection with the purchase or sale of a security."). Defendants' notice of removal of course fails to cite this paragraph of the Complaint.

Even setting aside the Complaint's facial denial that misrepresentations or omissions are alleged, the Complaint does not in any way allege misrepresentations or omissions made in

2

connection with the purchase or sale of a security. Rather, the allegations set forth in the Complaint listed on pages 4-5 of Defendants' Notice of Removal are ***all matters that Plaintiff alleges were true***.

The allegations on which Defendants rely for the erroneous proposition that Plaintiff alleges a misrepresentation or omission in connection with the purchase or sale of securities are the following:

1. Complaint ¶ 10, which states: "Pursuant to its reports filed with the Securities and Exchange Commission (the "SEC"), the Fund's primary investment objective is to provide total return through a combination of capital appreciation and current income." This allegation is simply a statement of fact as to the Fund's primary investment objective as set forth in its SEC reports. Nowhere in the Complaint does Plaintiff allege that this is not true.

2. Complaint ¶ 13, which states:

> As described in materials filed with the Securities and Exchange Commission ("SEC") or otherwise published to the investing public, a key piece of the return to the Fund's common shareholders was financial leverage. *See, e.g.*, N-CSRS, June 26, 2008 at 34 (advertising as a "Potential Advantage of Closed-End Fund Investing" the "Ability to Put Leverage to Work"). Financial leverage is the difference between the low rates paid by the Fund on its AMPS and the returns it would realize on its portfolio investments. The effect of this leverage was reflected in the Fund's regular cash distributions to common shareholders and described in the Fund's regular reports to its shareholders. The Fund's public statements indicated that the holders of its common stock could realize, as one of the significant benefits of this investment, leverage that would continue indefinitely, because, as described above, the term of the AMPS was perpetual.

These allegations are simply statements of information made publicly by the Fund, and additional information regarding the nature of leverage. There is no allegation in the Complaint that any of these statements are in any way untrue. To the contrary, Plaintiff alleges that these statements were true when they were made.

3. Complaint ¶¶ 2 and 12, which state:

3

> 2. In addition to issuing the common stock held by Plaintiff and the members of the putative class, the Fund issued auction market preferred shares ("AMPS"). The AMPS bore a preferred dividend right, with the dividend rate reset periodically through an auction mechanism. In effect, the AMPS provided the Fund with long-term financing at short-term interest rates, see Prospectus, Calamos Convertible Opportunities and Income Fund, filed with the SEC on November 12, 2003, at 25 (hereinafter "2003 Prospectus"). The auction mechanism provided liquidity to the holders of AMPS, as they were able to sell their AMPS at auction, although there was expressly no obligation to provide liquidity, *id.* at cover page, 24-25. The AMPS also provided flexibility to the Fund as AMPS were subject to lower coverage ratios than debt, and had other favorable terms. As equity securities, the AMPS had no maturity and did not ever have to be repaid.
>
> . . .
>
> 12. The AMPS issued by the Fund represented quite favorable financing for the Fund for several reasons described in more detail below, including: the interest rate and other costs were very favorable; the financing was perpetual; the constraints on the Fund associated with the AMPS were minimal; and the AMPS represented committed financing at a time when financing for almost any business was unusually difficult and costly to obtain.

These allegations are factual assertions regarding the capital structure of the Fund and the nature of AMPS. Once again, the Complaint nowhere asserts that any aspect of these matters are untrue or were misrepresented by any Defendant.

4. Complaint ¶ 22 and ¶¶ 25-27, which state:

> 22. Since February 13, 2008, auctions have consistently failed. These failures effectively rendered auction rate securities, including the AMPS issued by the Fund, illiquid. The auctions continued to fail throughout 2008-09, and to date liquidity has not returned to the auction rate securities marketplace.
>
> . . .
>
> 25. The favorable characteristics of the AMPS described in Paragraph 16 above continued to benefit the Fund after the failure of the auctions, and the failure of the auctions did not trigger any redemption obligation on the Fund or otherwise create a valid business reason for the Fund to redeem the AMPS. Nonetheless, the Defendants caused the Fund to redeem approximately 72.9% of all outstanding AMPS (approximately $280 million) between June 2, 2008, and June 26, 2008, at their issue price of $25,000 per share, and to replace the AMPS with

4

new financing that was less advantageous for the common shareholders. The result of the redemption was that the remaining 4160 shares of AMPS had the right to vote for two of the Fund's seven directors, effectively increasing by more than 3 times the voting power of each preferred share compared to the common shares. Then, between August 13, 2009 and August 24, 2009, the Defendants caused the Fund to redeem all then-outstanding AMPS, again at their issue price of $25,000 per share, and again to replace the redeemed AMPS with financing that was less advantageous for the common shareholders.

26. The Calamos Defendants announced efforts in the spring of 2008 to bring liquidity to the AMPS holders in spite of their recognition of the benefits of the AMPS to the holders of the common stock. On May 6, 2008, the Calamos Defendants held a conference call to describe their efforts. By May 19, 2009, the Calamos Defendants were able to announce that Calamos Defendants had obtained board approval to redeem all ARS issued by closed-end fund in the Calamos Defendants' family of funds.

27. On information and belief, the Defendants caused the redemption of the AMPS not to further the interests of the Fund or of the holders of its common stock; they did so to provide liquidity to the holders of the AMPS and likely as an attempt to placate their investment banks and brokers (who would thereby be protected from further liability for the illiquidity of the AMPS and from the risk that they would be required to buy the redeemed AMPS from the holders), so as to further the business objectives of the Calamos Sponsorship Group by responding to the pressures they experienced as a result of the failure of the auction rate securities auctions. Specifically, the same investment banks and brokers who marketed the ARS and AMPS were a key part of the business model of the Calamos Sponsorship Group: the Calamos Sponsorship Group earns fees by sponsoring new funds and the investment banks and brokers market the common shares of those funds. Consequently, the Calamos Sponsorship Group relies heavily on good relationships with the investment banks and brokers to enable them to market new funds and earn fees for the management of those funds. Indeed, the CAM report on Form 10-K for 2009 lists as a risk factor:

> [A] majority of our assets under management were attributable to accounts that we accessed through third-party intermediaries. These intermediaries generally may terminate their relationships with us on short notice.

Widespread dissatisfaction on the part of brokers and investment banks threatened the viability of this on-going business. Simply put, the bailout of the holders of the AMPS and the responsible brokers and investment banks conflicted with the interests of the Fund and the holders of its common stock. After the redemptions, CAM was able to maintain its good relationships: its Summary Annual Report to shareholders proudly reports:

5

> In this dramatically changed market environment, we have been able to retain and, in many cases, grow our shelf space at key partner firms.

These allegations pertain to the freeze up in the auction rate market in February, 2008, and the Defendants' responsive actions. There is no allegation of any misrepresentation or omission. To the extent paragraph 27 suggests that Defendants misrepresented the reasons for their redemptions of AMPS, those statements are in no way in connection with the purchase or sale of plaintiff's securities. Rather, these statements were after-the-fact excuses Defendants made for their breaches of fiduciary duty. Indeed, at the point in time these statements were made, plaintiff had long-before acquired the securities at issue.[1]

5. Complaint ¶¶ 30-31, which state:

> 30. To raise cash for the partial redemptions of AMPS, the Individual Defendants caused the Fund to arrange new debt financing (the "First Replacement Borrowing"). The First Replacement Borrowing was so disadvantageous that it was replaced the next year from three sources: issuance of additional common stock, diversion of cash generated by the business to pay down debt rather than make distributions to common shareholders, and yet another debt facility (the "Second Replacement Borrowing"; together with the First Replacement Borrowing, the "Replacement Borrowing").
>
> 31. Both the First Replacement Borrowing and the Second Replacement Borrowing are disadvantageous compared with the AMPS, for a number of reasons, including: the effective costs of the Replacement Borrowing are higher; the term is finite; and the constraints are greater, as detailed below.

These are simply allegations regarding the financing for the redemption of the AMPS. There is no allegation of a misstatement or omission.

6. Complaint ¶¶ 34(d) and (e), which state:

---

[1] To the extent Defendants attempt to argue that this is a misrepresentation in connection with the repurchase of the AMPS by Defendants, such arguments would not be meaningful because SLUSA expressly preserves actions under state law for claims relating to the purchase of securities by the issuer from holders of the issuers' own equity securities (AMPS are a form of preferred share, an equity security). 15 U.S.C. § 78bb(f)(3)(A)(ii)(I).

6

> (d) The loss of the leverage provided by the AMPS has materially altered the business model of the Fund, and significantly reduced the potential cash flow available for distribution to the common shareholders and has thereby defeated a significant feature of the investment rationale for the common shareholders, namely that such leverage would be available to provide cash flow for distribution to the common shareholders.
>
> (e) The value of the Fund's common shares is lower than it would have been if the AMPS had not been redeemed.

These allegations assert certain consequences of the redemption of the AMPS; they do not allege any misstatement.

    7.    Complaint ¶¶ 42 and 45, which state:

> 42. At all times alleged herein, the Individual Defendants, as trustees to the Fund, owed Plaintiff and the Class fiduciary duties, which duties include: (a) the duty not to unfairly favor the interest of one class of shareholders over another; (b) the duty not to cause one class of shareholders to receive a benefit greater than that to which they are entitled at the expense of another class of shareholders; and (c) the duty not to engage in conduct that frustrates the ability of the common shareholders to realize the benefits of an investment in the Fund, as described in the Fund's statements to the SEC and the public.
>
> 45. Also in contravention of these duties, the Individual Defendants chose to cause the Fund to partially redeem the AMPS and replace it with unfavorable debt financing, thus eliminating one of the major benefits of the investment.

These allegations set forth certain of the Defendants' legal duties to Plaintiff and the Class as trustees, and one of the manners in which their conduct breached those duties. Again, they do not allege a misstatement or omission.

Defendants' assertion that the cited allegations – or *any* of the allegations in the Complaint – allege an untrue statement or omission in connection with the purchase or sale of a security, or the use of a manipulative or deceptive device or contrivance in connection therewith, simply do not withstand a reading of the Complaint.

Moreover, nothing in the Complaint in any way ties any misstatement, omission or manipulation to the purchase or sale of a security. Plaintiff has owned shares of the Fund since 2006, and the definition of the putative Class is based on the beneficial ownership of common shares on or after March 19, 2008, without regard to the date on which the shares were acquired.

7

This is a case concerning the breach by trustees of their duties to common shareholders; it does not involve claims that those shareholders were misled when they acquired their shares.

The Complaint simply does not contain allegations of the type necessary to create federal jurisdiction under SLUSA. Moreover, claims such as those asserted here are specifically excluded from the federal diversity jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), by 28 U.S.C. § 1332 (d)(9), which excludes from CAFA's grant of federal jurisdiction state law claims concerning corporate governance or claims relating to fiduciary duties related to or created by a security. Accordingly, this matter must be remanded. *See* 15 U.S.C. § 78bb(f)(3)(D).

### III. CONCLUSION

For the reasons discussed above, Plaintiff respectfully requests the Court remand the action to state court.

Dated this 5th day of November, 2010.

Respectfully submitted:

By: /s/ Carol V. Gilden

Carol V. Gilden
Cohen Milstein Sellers & Toll PLLC
190 South LaSalle Street, Suite 1705
Chicago, Illinois 60603
t: (312) 357-0370
f: (312) 357-0369
Atty. ID: 6185530
cgilden@cohenmilstein.com

Steven J. Toll
Joshua S. Devore
Joshua M. Kolsky
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005
t: 202.408.4600
f: 202.408.4699
stoll@cohenmilstein.com
jdevore@cohenmilstein.com
jkolsky@cohenmilstein.com

Lynn L. Sarko
Keller Rohrback, LLP
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
t: (206) 623-1900
f: (206) 623-3384
lsarko@kellerrohrback.com

Gary Gotto
James A. Bloom
Keller Rohrback, P.L.C.
3101 North Central Avenue, Suite 1400
Phoenix, Arizona 85012
t: (602) 248-0088
f: (602) 248-2822
ggotto@krplc.com
jbloom@krplc.com

9

## **CERTIFICATE OF SERVICE**

    I, Carol V. Gilden, hereby certify that on November 5, 2010, I caused to be filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record in this matter who are registered with the Court's ECF filing system.

                                                           /s/ Carol V. Gilden